02-11-141-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00141-CV

 

 


 
 
 In the Interest of H.N.H.; J.L.H., Jr.; and J.N.H.,
 The Children
 
 
  
 
 
  
 
 


 

----------

 

FROM THE 362nd
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          

I.  Introduction

          Appellant
Mother appeals the trial court’s judgment terminating her parental rights to
H.N.H.; J.L.H., Jr.; and J.N.H.  In nine points, Mother challenges the legal
sufficiency of the findings under Texas Family Code section 161.001(1)(D), (E),
and (O) to support the termination of her parental rights to each of her three
children.  We will affirm.

II.  Factual
and Procedural Background

          Mother
and Father are the parents of H.N.H.; J.L.H., Jr.; and J.N.H.  The children’s
home life was somewhat convoluted:  Mother and the children lived with Father
and his significant other Kimberly, along with the children that Father
fathered with Kimberly.  The three adults exposed the children to homes that
were dirty and had unsafe living conditions, including domestic violence, which
led to the removal of the children.  The following factual background documents
what the children endured before their removal, how Mother fared on her service
plan after her children were removed, and the reasons why recommendations were
made to terminate Mother’s parental rights to her children.

          A.      H.N.H.’s
Health Issues

                   1.       Lice

          Claire
Nieswiadomy testified that while she was the school nurse at Evers Park
Elementary, she saw H.N.H. in her office frequently over a two-year period
beginning in September 2008.  Nieswiadomy agreed that H.N.H. had missed
approximately twenty-four days of school one year and twenty-one days of school
the following year and that most of those absences were due to her chronic
infestations of head lice.  Nieswiadomy testified that H.N.H. came to school
with head lice almost daily for two years and that this was the first time in
her career that she had seen a child keep a head lice infestation for two
years. 

          Nieswiadomy
went over with Mother “many, many times” why lice was a problem and how to
correct the problem.  Nieswiadomy estimated that she went over the instructions
with Mother sometimes weekly and sometimes every day and that she had talked to
Mother about removing lice thirty or forty times. Because Nieswiadomy was aware
from her conversations with Mother that Mother had an impediment to learning,
Nieswiadomy told Mother how to treat the lice “very, very simply and very, very
clearly and repeatedly and gave the directions to her verbally.”  Nieswiadomy
gave Mother combs and demonstrated how to use them, supplying her with oral and
written instructions.  Nieswiadomy always rechecked H.N.H. when she came back
to school after Mother had treated her head; sometimes H.N.H. came with the
active medication still in her hair, and other times she came with solutions on
her hair that Nieswiadomy could not identify.  Nieswiadomy treated H.N.H. in
the nurse’s office “a lot of times” in an effort to keep her in the classroom; Nieswiadomy
testified that H.N.H. would have missed more school if not for Nieswiadomy’s
efforts. 

          Nieswiadomy
said that most parents solved a lice problem in a couple of days, but Mother
did not.  Nieswiadomy testified that Mother had put into practice her advice
only “[v]ery minimally.”[2]  Nieswiadomy said that
Mother’s burden to care for her children was not alleviated because of her possible
learning disability. 

          Nieswiadomy
opined that it was not a good parenting practice to allow a child to stay
infested with head lice and that it could be emotionally or physically damaging
for a child to have chronic infestations of head lice.  Nieswiadomy thought
H.N.H. would not have a normal childhood because her peers and teachers did not
look at her the same way as other children.  Nieswiadomy said that the lice
infestation would subject H.N.H. to ridicule, which Nieswiadomy opined would
have a lifelong impact. 

                   2.       Stomach
Issues and Asthma

          Nieswiadomy
testified that H.N.H. had chronic stomachaches and that she had battled
problems with hunger and constipation, which probably contributed to her stomachaches.
 H.N.H. would “very frequently” tell Nieswiadomy that she was hungry but would
eat only a cracker.  Nieswiadomy said that H.N.H. “did not really like normal
food very much.” 

          Nieswiadomy
recalled that Mother said that she did not get up in time to feed H.N.H. and
that she frequently brought H.N.H. to school late.  On one occasion, Mother
brought H.N.H. to school and said that she needed to eat, but the school
cafeteria was already closed.  Nieswiadomy testified that it was harmful for a
child’s emotional and physical development to not feed her breakfast and that a
kindergartner needed to eat breakfast because she was growing and needed
nutrition on a regular basis.  Nieswiadomy agreed that this had occurred for
two years. 

          Nieswiadomy
testified that H.N.H. had chronic respiratory problems and that her asthma was
not being properly treated.  Nieswiadomy talked to Mother about how to treat
H.N.H.’s asthma, and Mother responded that she was taking care of it.  Nieswiadomy
recalled that it took her quite a while to get asthma medication at school and
that she had to call H.N.H.’s doctor to get the medication. 

                   3.       Hygiene
Issues

          Nieswiadomy
said that H.N.H. “very frequently” came to school dirty:  she had a dirty face
(covered with mud and dried mucous), dirty hands, dirty arms, dirty legs, and filth
and grime under her fingernails and toenails; her clothes were typically dirty;
and her hair was dirty.  Nieswiadomy said that H.N.H.’s hygiene was “very
poor.”  Nieswiadomy discussed H.N.H.’s hygiene with Mother, and sometimes
H.N.H. came to school “a little bit cleaner” afterwards, but “it was never a
regular thing that she was clean.” 

          B.      H.N.H.
Receives Burns

          Stephanie
Kolb, an investigator for CPS, received a referral in December 2008 because
H.N.H. had received burns to her legs and her hand from a space heater.  After
Kolb investigated, she ruled the case “reason to believe” for medical neglect
due to the delay before Mother sought medical care for H.N.H., “reason to
believe” for physical neglect due to the conditions of the home, and “reason to
believe” for neglectful supervision because Mother knew that the heaters in her
home were hot to the touch and still allowed the children to be around them.  

          With
regard to the medical neglect, H.N.H. received the burns around 10:30 a.m. when
one of the children pushed H.N.H. into the heater while Mother was present.  A
family member called for a welfare check on the home around 2:00 p.m. after
hearing about the burns.  When police responded to the home, they immediately
called EMS.  H.N.H. would not provide detailed information, so the Department
of Family and Protective Services[3] had
to rely on Mother’s explanation of the burns.  The Department questioned the
validity of Mother’s explanation—that one of the younger children in the home
(age two or three) had pushed H.N.H. (age six) into the heater.  To the
Department, the injuries did not equate to H.N.H.’s having been pushed into the
heater because she had injuries to her inner leg, outer leg, and palm.  One CPS
worker said that “even to this day, I still wonder how that happened because
it’s almost like she had to straddle it when she fell and then it hit her on
the other side.”  H.N.H.’s burns were second-degree burns, requiring an
overnight hospital stay.  Kolb agreed that the four-hour delay in receiving
treatment for second-degree burns to a small child was “pretty significant.”[4] 

          With
regard to the “reason to believe” for physical neglect, Kolb testified that a
water heater had broken two or three days prior to her visit and that the
floors were still wet and “completely black from mud.”  Kolb said that roaches
were crawling on every wall, that there was rotten food in the kitchen, and
that the environment was not safe for small children. 

          Kolb
sent the family, including Father and Kimberly who were living in the home, to
Family-Based Safety Services (FBSS) at the conclusion of the investigation. 

          Julissa
Rodriguez, the FBSS caseworker assigned to Mother’s case, testified that both
families participated in services and that Mother was asked to participate in
homemaker services and was given a referral to MHMR.  Rodriguez went to
Mother’s home and talked to her about the concerns that led to the case being
opened on her.  Rodriguez talked to Mother about parenting tips, health and
safety hazards inside the home, cleaning the home, and dealing with lice.  Rodriguez
provided Mother with a lice removal kit and talked to her about putting sheets
in the dryer to kill the lice and about cleaning the children and making sure
that their scalps did not have eggs or nits.  Rodriguez observed that whenever
she went to the home, the children had “things” on their faces, and Rodriguez
talked to Mother about washing and hygiene issues.  Rodriguez could not recall
whether she ever saw the children when they were not dirty.  Every time that
Rodriguez pointed out to Mother that the children were not clean, Mother had an
excuse—i.e.,
that they were eating, that she was “fixing to” clean them, or that they had
just finished eating. 

          Mother
completed the services and was discharged from FBSS in May 2009. 

          C.      Injury
to Another Child in Household

                   1.       Supervisor’s
Testimony

          Stephanie
Lopez, a supervisor in the investigative section of CPS, testified that CPS
received a referral that the children had lice and that one of Kimberly’s
children had sustained “some pretty significant injuries.”  It was unknown who
had inflicted the injuries on Kimberly’s child, so there was a subsequent
referral on Mother and her children.  Lopez and Ashley Hambrick investigated
the referral on April 12, 2010. 

          Lopez
interviewed one of Mother’s children who had lice and found that “the lice was
extremely active.  You didn’t have to be close up.  You could see it crawling
in his hair.”  Lopez discussed the lice problem with Mother, and Mother said
that she had been treating the lice.  Lopez asked Mother to show her the lice
medication, but Mother could not locate it. 

          With
regard to the injuries on Kimberly’s child’s face, Mother said that she had no
idea how the injuries had occurred.  Mother later said that Kimberly’s child had
received the scratch on her face when she ran into the corner of the
television.  However, Mother’s son J.L.H., Jr. said that Kimberly’s child had misbehaved
and had received the injury when Mother took a toy truck that had a broken
light on it and hit her with it.  With regard to a bite mark and bruise on
Kimberly’s child’s shoulder, Mother admitted that one of her children had
caused it.  Lopez explained to Mother why a two- to three-week-old injury that
still had bruising concerned the Department, and Mother had no response. 

          Lopez
talked to Mother about disciplining the children, and Mother said that she had watched
Kimberly’s children and that she had disciplined them as well as her own
children with a belt.  Mother did not mention when, where, or how often she
used a belt to spank the children.[5]


          J.L.H.,
Jr. also mentioned to Lopez that Father and Mother fought by throwing things at
each other and by hitting.  J.L.H., Jr. said that Father had tried to hit
Mother, but she had moved out of the way and had ended up with only a scratch. J.L.H.,
Jr. also told Lopez that Father and Kimberly had fought.  Lopez testified that
the domestic violence in the home concerned the Department because it creates
the risk of emotional or physical abuse of the children and because the
children could be injured when the adults throw objects. 

          Lopez
told Mother that Kimberly could not live with Mother and her family. Lopez
testified that if Father, Kimberly, and Mother were still living together in
late November or early December 2010, that would be inconsistent with good
emotional and physical health of the children. 

          Lopez
summarized the Department’s concerns as follows:  Mother had a previous case—the
referral for H.N.H.’s burns—in which she had worked
in-home services; Mother was now involved in a new case with concerns of
domestic violence; and a small child had received injuries, with no
explanation, on a vital part of her body.  CPS was concerned about whether the
injuries were received during a fight between the adults or whether one of the
adults had inflicted the injuries on the child.  Based on the fact that Kimberly’s
child exhibited injuries and that the cause of those injuries could not be
determined, the Department felt that there was a sufficient risk to the
children’s safety and well-being and that they needed to seek the trial court’s
permission to remove the children.  Lopez thus submitted an affidavit to the
trial court for removal of the children. 

                   2.       Investigator’s
Testimony

          Ashley
Hambrick, an investigator for CPS, testified that she was also involved in the investigation
on April 12, 2010.  Hambrick went to the school to talk to H.N.H., who was
seven at the time.  H.N.H. said that sometimes Father slept in the room with
Mother and that sometimes he slept in the room with Kimberly.  H.N.H. told Hambrick
that nothing happened when she got in trouble at home but that Kimberly was
mean to her children.  H.N.H. also told Hambrick that one of Kimberly’s
children had a bite mark on her but did not know how she had received the bite.
 H.N.H. said that Mother sometimes spanked Kimberly’s children with a belt.  

          Hambrick
learned that Kimberly and Mother took turns watching each other’s children, so
there was no way to determine who caused the injuries to the child.  One child
of Kimberly’s had a cut on her face and some bruises on her back, and neither
Mother nor Kimberly provided an explanation for the injuries. 

          Hambrick
made a referral to the District Attorney’s Office because there was a risk of
physical abuse to the children and because there were unexplained injuries on
Kimberly’s children.  Additionally, Mother had worked FBSS previously, and
there was a concern regarding Mother’s lack of protectiveness of her children.  Hambrick
testified that she did not remove the children at that time, but she submitted affidavits
to the trial court. 

          D.      CPS
Removes Children 

          Mother’s
children were ultimately removed on April 14, 2010, due to concerns of physical
neglect and medical neglect.  The physical neglect was related to the concern
that Kimberly’s injured child, who lived in the same home as Mother’s children,
was injured by someone in the home.  There was a moderate level of concern, not
the most severe, based on the fact that no one could explain how the child had received
her injuries.[6] 

          E.      Perspectives
Given at Trial 

                   1.       CPS
Caseworker’s Perspective

                             a.       Services

          Dea
Davis, Mother’s CPS caseworker, testified that when the new case was opened in
April 2010, the services that were offered to Mother included a psychological
evaluation, in-home homemaker trainer services, healthy relationships classes,
and anger management classes.  Davis later extended Mother’s services beyond
those originally set up because CPS “wanted to make sure that [they] offered
her all the services possible to help reassure the safety of her children if
they were returned home to her.  And it had been requested by the parent
trainer, but also with some reservations of she wasn’t sure whether [Mother]
would actually benefit from the additional time.” 

          Mother
completed the homemaker training class, but the trainer was concerned that
there were times during the course when Mother stopped making progress in that
the house was not as clean or as well-kept as it had been previously.  Mother
successfully completed the anger management classes.  Mother did not complete
counseling with Dr. Greer because Dr. Greer terminated the counseling sessions.
 Other individual counseling sessions were offered with Mark Dittloff to help
Mother deal with the stress of having a CPS case and with her children, and
Mother attended most of those sessions. 

                             b.       GED
Program and Literary Class

          The
services CPS offered to Mother during the course of the case, including a GED
program, were intended to help Mother establish her independence.  They were
encouraged so that Mother could develop a “job skill” and move forward with
DARS, which helped people locate employment.  DARS referred Mother to Denton
ISD, but Mother did not follow through at that time.  In January, Davis
reinitiated the idea of Mother’s obtaining her GED and had found a literacy
program that Davis thought would benefit Mother.[7]  Mother
was eager to participate in the GED program but was hesitant about the literacy
program, stating that she knew how to read and therefore did not need to take
the literacy program. 

                             c.       Employment
and Income

          Davis
had no knowledge of Mother ever holding a job.  With no employment history, the
Department was not very confident that Mother could support her children, even
though Mother was part of the Home and Community-Based Services, which Davis
testified could help Mother find other resources in terms of job skills like
cleaning homes.  The Department was thus concerned that if the children were
returned to Mother, she would not have the income to provide her children with
all the necessities and to continue to pay for her home.  But Davis testified
that Mother received SSI and that her children might possibly be eligible for
SSI, which could provide additional income for the family. 

                             d.       Visits

          Mother
was timely to her visits, but she missed several because Father had encountered
car problems.  He was the sole provider of her transportation to the visits.  Mother
was appropriate during the visits, and the children were affectionate toward
Mother.  At the last visit prior to the termination trial, Davis noticed that H.N.H.
gravitated more toward the foster father than Mother, but that was Davis’s only
concern during all of the visits.[8] 

                             e.       Stability
of Housing

          Throughout
the case, CPS was concerned about the stability of Mother’s housing—because she
had lived at four residences while the case was open—and her
relationships—because of the unstable relationship between Mother, Kimberly,
and Father.  Davis testified that CPS had set as one of its goals for Mother to
establish a consistent residence for at least six months, but Mother never
accomplished that.  Mother had resided on South Wood Street for approximately two
months[9] at
the time of the trial, which did not allow for adequate time to review whether Mother
could maintain a safe home for the children.  It was the first time that Mother
had lived in a home without Father and Kimberly.  Davis had visited Mother’s
home on Wood Street and had found it to be suitable and appropriate; Mother had
acquired the furniture and necessities for the children. 

                             f.       Domestic
Violence

          Davis
was not personally aware of domestic violence in the home, other than the
statements in the affidavit regarding what J.L.H., Jr. told a caseworker.
J.L.H., Jr. reported witnessing violence in the home between the adults.[10]  An incident in
the home on August 12, 2010, resulted in broken windows.  The domestic violence
caused concern for the best interest of the children. 

          Davis
had no concerns about whether Mother loved her children.  Davis was concerned,
instead, about the stability in Mother’s housing and her continued relationship
with Father and Kimberly.  When asked about the specific concerns that she had
about that relationship between the three adults, Davis said, 

It goes back to the
beginning, when the initial referral came in and the decision to remove, that
there was physical abuse in the home, and that either [Mother] or [Kimberly]
would be possibly the perpetrator. So they were asked to split up at that
point. And the concerns would be that her children would be in the home with someone
that was physically abusive, as well.

Davis
did not think that Mother had the protective nature required to protect her
children from further abuse; Davis thought that Mother would continue to choose
her friendship and relationship over the safety of her children.[11]  Moreover,
Davis did not believe that Mother was an independent thinker because she had
looked to her attorney for answers during the permanency conference and because
the parenting homemaker had expressed concerns over Mother’s ability to think
for herself. 

                             g.       CPS’s
Goals

          At
the outset of the case, CPS’s goal was family reunification.  The goal changed
to termination at the permanency hearing in September 2010 because the
Department determined that Father and Kimberly were not making the progress
that the Department wanted to see and that Mother would continue the
relationship with them even if their parental rights were terminated.[12]  CPS
was not willing to return the children if Mother was living with Father and
Kimberly. 

                             h.       Department’s
Recommendation

          The
Department was of the opinion that it was in the children’s best interest to
terminate Mother’s parental rights because of Mother’s actions and inactions,
specifically her past history with CPS, her continued relationship with Father
and Kimberly, her continued attraction to Father, her inability to act
independently of Father’s approval, her failure to protect her children, her
failure to maintain stable housing for six months, and her failure to gain
independence so that she could support her children if they were returned to
her. 

                    2.       Psychologist’s
Perspective[13]

          Mark
Foster, a psychologist, testified that he met with Mother in May 2010 and
conducted a psychological evaluation on her.  Mother’s intellectual abilities
fell in the mild mental retardation range with an IQ of sixty-five.[14]  Mother’s
performance IQ was seventy-five.  Foster had mild concerns that Mother had
tested lower than her actual IQ due to her emotional functioning and
personality factors, and he believed that Mother’s actual IQ might be “a little
bit higher, but it’s not going to be significantly higher.” 

          Foster
testified that a person with an IQ similar to Mother’s might be able to benefit
from services but probably would not benefit significantly; it depended on the
individual.  When asked whether a person with an IQ of sixty-five and a
performance IQ of seventy-five could complete services, Foster said that it
would depend on whether the services were presented at her level and the level
of her motivation.  Foster opined that it would be very difficult for Mother to
successfully complete the services offered to her due to her mental abilities.  Foster,
however, testified that Mother’s IQ seemed to indicate that there may be
meaningful changes in her behavior but that it would be considerably slower
than most people, but Foster agreed that indicated that Mother could change. 

          Foster
testified that 

[a]n IQ of 65 has
very significant consequences in terms of parenting ability.  What we know from
research on IQ and parenting is [ ] that once an individual’s IQ reaches 60,
regardless of how much you provide services to an individual, regardless of how
much parenting classes and counseling and supportive services you provide, the
individual is not able to.  And of course, her IQ of 65 is above that, but it’s
-- it’s certainly in that range.

 

          What is
more significant, perhaps, for day-to-day living is her verbal IQ of 59. 
Individuals with an IQ of 59 -- and this is also mirrored if you look under
academic achievement with her reading and math skills, which fall generally
between a second- and third-grade level.

 

          Individuals
with intellectual abilities and reading skills, so forth, at this level very
often have difficulty following directions.  They often have difficulty
administering medications.  They often have difficulty following anything but
the simplest instructions.

 

          They are at
risk of being manipulated by others because they misunderstand what people are
saying to them or that they’re not able to realize when someone is taking
advantage of them. 

With
IQs that are in the range of Mother’s, studies suggest that emotional maturity
is also delayed.  For instance, individuals with Mother’s combination of
personality characteristics very often seek out a relationship with a person
who will take care of them and will surrender their personal boundaries in
return for being taken care of.  Such individuals are often prey for
individuals who are looking for someone to take advantage of.  Foster said that
he often saw increased levels of domestic violence with people who tested like
Mother. 

          Based
on the testing, Foster concluded that Mother was an individual who was very
likely to present as immature, was likely to be emotionally very dependent, was
likely to seek out relationships where others would take care of her, was at
risk of being manipulated by others, and was likely to have difficulty resolving
conflict in a mature manner.

          Foster
said that Mother’s emotions are very likely to influence her decision-making and
that her thought processes would be very compromised when she is upset.  Foster
expected Mother to have “very poor frustration tolerance”; the things most
people take in stride, like the challenges of being a parent, would pose more
difficulty for Mother.  Foster testified that one of the risks to the children
as a result of Mother’s poor frustration tolerance is inappropriate discipline
practices.  Foster said that children learn frustration tolerance primarily
from their parents and that when such skills are not modeled effectively by
parents, the children spend the rest of their lives trying to learn such skills
and “very often suffer deficits throughout their lifespan.” 

          Foster
testified that it would be detrimental for a child to observe an unhealthy
man-and-woman relationship in a household and that a polygamist-type
relationship would affect a child’s moral development.  Foster testified that
it is unlikely that Mother would be willing or able to change her relationship
status for the benefit of her children. 

          Foster
also testified that it would be detrimental to a child to observe domestic
abuse and that the way Mother treated Father or Father treated Mother was something
that the children would model in their potential future relationships.  Children
who are raised in homes with domestic violence go between two extremes: (1)
there are those who are very angry—acting out and having trouble managing their
emotions and dealing with authority figures, as well as their peers and (2)
those who become hyper-responsible—walking around on eggshells because they are
afraid of setting off a conflict between the parents.  Foster testified that
children are likely to act out with their siblings physically if there is physical
abuse in the household. 

Foster
said that parents with Mother’s characteristics often have a hard time
separating themselves from their child’s age-appropriate behavior and view a
child’s spilling his milk as the child trying to punish the parent.  Because
such parents are unable to separate their emotions from their decision-making,
they often make very poor parenting decisions.  Foster said that Mother can
make parenting choices, but those choices are very often going to be made based
on how she feels about the situation instead of the facts or demands of the
situation; typically, the child’s needs are secondary, which creates a risk for
the child. Foster testified that the following were not examples of a parent
putting her children’s needs first: allowing a child to go to school hungry; repeatedly
exposing children to CPS; allowing a child to receive second-degree burns and
not seeking medical attention for at least four hours; and failing to eradicate
children’s head lice for almost two years.  Foster agreed that if a child
received second-degree burns and if the parent had contacted family members for
medical assistance, such act would constitute putting the child first.  Foster
similarly agreed that if a child is a picky eater and would not eat but the
parent had packed a lunch for the child, such act would constitute putting the
child first. 

It
did not surprise Foster that Mother was unable to keep her children free from
head lice for over a year because not being able to follow through is typical
for someone with an IQ similar to Mother’s.  It did surprise Foster that Mother
had not rid her children of head lice after instructions were provided thirty
or forty times; Foster opined that another dynamic besides intelligence, like
Mother’s choice to not take care of the problem, had come into play. 

Foster
testified that people with IQs similar to Mother’s typically look on the bright
side of things and often fail to learn from experience.  When people are overly
focused on the positive in their lives, they often do not make needed changes.  The
fact that Mother had a previous CPS case suggested that she had failed to learn
from that experience. 

In
light of the results from Mother’s psychological evaluation, Foster opined that
it would create significant risks to return the children to Mother. 

                    3.       In-Home
Parenting Provider’s Perspective

                             a.       Mop
& Glo Incident

          Lititia
Hickey testified that she had provided in-home parenting services to Mother
from July 2010 until January 2011.  When Hickey met with Mother, she revealed that
H.N.H. had spilled Mop & Glo on herself when she was one.  The fact that a
child was able to pour a poisonous substance all over her body indicated to
Hickey that H.N.H. was not being properly supervised.  Hickey testified that an
average parent would have attempted to call poison control or another emergency
contact when H.N.H. doused herself with Mop & Glo; in Hickey’s opinion, it
was not reasonable that Mother did nothing.[15] 

                                      b.       H.N.H.’s
Asthma

          Additionally,
while H.N.H. was in foster care, CPS asked Mother for H.N.H.’s nebulizer
because she had asthma, but Mother refused to provide it. Mother wanted to keep
it at her house until the children were returned to her. Hickey did not believe
that was appropriate parental behavior. 

                                      c.       Relationship
with Father and Kimberly and

                                                Domestic
Violence

          Hickey
testified that part of the reason that Mother’s children were in CPS custody
was because of Mother’s relationship with Father and Kimberly.  Mother said
that they were all friends who lived together.  Mother thought that her
relationship with Father was acceptable, and she had a difficult time trying to
separate herself from him because she had been in a relationship with Father
since she was very young and because he was the father of her three children. Mother
relied heavily on Father, including for rides to her MHMR appointments, and
appeared to believe whatever he told her, which Hickey saw as a problem. Mother
told Hickey that her children came first, but Hickey did not see evidence of
that; Mother continued to have a relationship with Father and Kimberly despite
acts of domestic violence.  Mother told Hickey that Kimberly had pulled her
hair and that Mother had pushed Father when he had tried to break up the fight.
Mother also admitted that during one family violence incident, she left a
handprint on Father’s chest.  Police were called to the house, and Mother was
given an opportunity to leave the home in lieu of being arrested.  Hickey
testified that such behavior is not appropriate around children. 

                                      d.       Mother’s
Cognitive Functioning

          Mother’s
cognitive functioning was less than average, which raised concerns regarding
her ability to understand what Hickey was trying to teach her.[16]
 It seemed that most of the time it was hard for Mother to understand what Hickey
was trying to do for her.  Hickey noted that Mother did not appear to
understand that her current housing issue did not help her show stability.  Mother
told Hickey in January 2011 that she was not sure why CPS had asked her to do
“all this stuff.”  Mother made that statement, showing that she did not
understand what CPS was doing, nine months after her children were removed in
April 2010. Hickey testified that small children cannot afford a parent who
“just can’t get it.” 

                                      e.       Conditions
of Homes

          When
Hickey met with Mother in July 2010, Mother admitted that it was her fault that
her children were in CPS custody because she should have kept her home cleaner.
 Mother’s house was dilapidated, had a foul odor, and had a roach infestation.  Hickey
thought that the foul odor in Mother’s house was attributable to the old
carpeting.  Hickey said that when the old carpeting was removed, the odor was a
little better, but there was always an odor in the home.  There were three pets
living in the house, and there were roaches in the animals’ food and water. 
The pets inhibited Mother’s ability to keep the roaches and flies out of the
house.  In August 2010, there were “lots of flies” in the home; Mother
explained that was due to leaving the door open while she was giving the dog a
bath. Hickey said that it was not an appropriate set of conditions for small
children to be living in. 

          In
November 2010, Hickey observed Mother using a gas heater, an electric heater,
and the oven to heat the home because there were broken windows that were not
allowing the heat to stay in.  On several occasions, Hickey noticed that
additional windows had been broken out.  Mother explained to Hickey that a
couple of the windows had been broken during her fight with Father and that a neighbor’s
motorcycle had “kick[ed] up rocks from the gravel driveway” and broken other
windows. 

          Hickey
summarized that Mother had lived in the dilapidated home from July to December
2010.  To Hickey’s knowledge, no one forced Mother to live in those circumstances.
 Mother told Hickey that she was going to fix the home and that the rent would
be reduced.  Hickey saw Mother’s father working on the home.  Hickey
encountered Mother’s landlord in November, and the landlord said that Mother
owed $40 on her November rent and a full month’s rent for December.  The
landlord then said that she was evicting Mother, Father, and Kimberly because
they had not paid their rent and because they had stolen some tools and a lawn
mower.  Hickey urged Mother to find a better place to live, and Mother moved in
with her mother[17] because she did not want
to get evicted. Mother called Hickey a month before the termination trial and
told her that she had rented a house. 

                                      f.       Services

          As
part of the homemaker services program, Hickey concentrated on housekeeping due
to all the concerns with the home, but she also went over nutrition and
cooking, personal hygiene, budgeting, stress management, home safety, and time
management.  Mother worked hard on the initial home and made it a lot cleaner,
but the home itself was worn down.  Although Mother initially “was very adamant
about getting her house cleaned up.  Toward the end, it appeared that she
wasn’t doing as much in light of cleaning.”  On November 30, Hickey sent
caseworker Davis an email that said that Mother loved her kids but that Hickey
did not see that Mother had the ability to follow through with her services and
gave the impression that she did not really care. 

          Hickey
noted that Mother’s behavior initially showed that she was benefitting from the
services that Hickey was providing, but at the end of the services, she had not
demonstrated that she had “sufficiently benefitted” from the services that
Hickey had provided to her.  Hickey said that Mother was still in contact with Father
and Kimberly, that Mother was still relying on Father, that she was not
implementing the things that Hickey had taught her through in-home parenting
and homemaker services, and that the house was still a mess.  So although Mother
successfully completed the homemaker services because she had made some
improvements, Hickey did not believe that Mother had sufficiently alleviated
the risk of abuse or neglect for her children based on what she had learned
from Hickey.  Hickey noted that Mother would require a good support system and
guidance to assist her with parenting and maintaining her home.  Hickey,
however, was unaware of anyone in Mother’s family who was willing and capable
of supporting her and guiding her.[18]
 

                    4.       Mother’s
Perspective

                             a.       Parenting

          Mother
testified that her children are ages four, six, and seven.  Mother testified
that age appropriate behaviors for a seven-year-old child included watching
television, hanging out with friends, playing outside, and going to the park;
that age appropriate behaviors for a six-year-old child included playing
outside, going to the park, and going to a birthday party; and that age
appropriate behaviors for a four-year-old child included playing with toys,
playing outside, going to the park, watching television, coloring in a coloring
book, and having free time. 

          Mother
did not understand the word “vocabulary”; when the question was rephrased, she
said that her four-year-old child could say anything, but she did not know
whether he could make complete sentences.  Mother said that she helped her
seven-year-old child with her homework when she was six and that her homework
included words like “I,” “am,” “do,” “did,” “be,” and “may.” 

          With
regard to the lice infestation, Mother testified that she had used the lice
medicine on H.N.H.’s head and had combed it through her hair but that the
medicine did not help.  Mother testified that she knew she needed to wash the
bed linens and that she had done that.  Mother had also been told that she
needed to treat the cloth furniture and the carpets for lice. 

          With
regard to her children’s hygiene issues, Mother disagreed that her children
were dirty when they were removed. 

                             b.       Relationship
with Father and Kimberly

          Mother
had been in a relationship with Father since she was sixteen years old, and she
was twenty-five years old at the time of the trial.  Mother testified that Father
was a good father because he “did anything for his children,” including giving
up the last of his money to buy them food.  Mother testified that Father had
never made her do anything that she did not want to do. 

          Mother,
Father, and Kimberly lived together for three years while Father and Mother
were a couple.  During that time, Kimberly had two children with Father, but
Mother was not aware that Father and Kimberly were having sexual relations and
was told after Kimberly’s children were born that they were Father’s.  Mother testified
that she had heard that her children knew that Father slept with Mother one
night and with Kimberly one night; Mother said that surprised her because she
was not with Father at that time.  Mother said that all she knew was that Father
slept in the front room.  Mother initially believed that her relationship with
Father and Kimberly was appropriate for her children, but Mother later agreed
that it was not appropriate for her children to see their father living with
another woman with whom he was having children.  Mother allowed her children to
live in that house and continue to see that for two years. 

          Mother
agreed that she never had any CPS issues until Kimberly moved in.  Mother said
that Kimberly never disciplined or laid a hand on Mother’s children when Mother
was present, but Mother did not know whether Kimberly whipped Mother’s children
when Mother was not there.  Mother believed that her children were removed
because of Kimberly.  

          From
the time the CPS investigation started, Mother knew that the living
arrangements that she had for her children were not appropriate.  Mother did
not recall the first time that the Department told her that she needed to
separate herself from Father and Kimberly;[19] she agreed that it could
have been in April or May 2010.  Mother said that she understood that she
needed to stay away from Father and Kimberly in order to continue fighting to
get her children back, and Mother testified that she would not go around Father
or Kimberly.  However, Mother agreed that as of February 2011, she was still
riding in the car with Father and Kimberly, which was not complying with what
the Department had asked her to do. 

          Mother
was in the car with Father and Kimberly in February 2011 when a car accident
occurred.  Mother admitted that CPS had told her several times that the three
of them could not be together.  Mother said that was the only time that she had
ridden with them and that her mother usually drove her wherever she needed to
go. 

          Mother
agreed that she was with Father and Kimberly in March when she saw Davis’s
supervisor at the grocery store and that she knew that she was not supposed to
be with Father and Kimberly.  Mother said that she had not spoken to Father and
Kimberly “this month,” which was April 2011. 

          Mother
was aware that Father had relinquished his parental rights to her three
children on the Friday before the termination trial started and that he could
no longer have contact with them.  Mother testified that she was no longer with
Father; she had broken up with him “a long time ago.”  However, Mother admitted
that the Friday before the trial, she stood in the courtroom next to Father and
Kimberly.  Mother, however, had not ridden with them; she had walked to the
courthouse. 

          Mother
had a cell phone, and Father and Kimberly were on the contract with Mother.  At
the time of the termination trial, Mother had not gotten around to having
Father and Kimberly removed from the cell phone plan.  Mother agreed that if
she had taken Father and Kimberly off her cell phone plan, it would have shown
the judge that she was serious about not having any more contact with them. 

                             c.       Domestic
Violence

          Mother
testified that the police came out to her home twice because of domestic
disturbances.  Mother said that one incident was between her and Kimberly and
that the other incident did not involve Mother. 

          Mother
said that Kimberly started the fight that occurred in November before Father
and Kimberly moved out.  Mother could not remember what she said to Kimberly
that caused her to become aggressive, but Kimberly responded by calling Mother
“a dumb broad.”  Mother then called Kimberly “a dumb broad” and went to her
room.  Mother initially told Kimberly “not to lay a hand” on her, or Mother
would call the police.  Kimberly told Mother that she did not care, and then
Kimberly chased Mother into her room, pushed Mother, and pulled her hair. Mother
then tried to defend herself.  Mother called the police but then tried to
cancel the call because “everything just settled down.”  Before it settled
down, Father tried to break up the fight, and Mother pushed him.  Father called
the police.  The police told Mother that she needed to leave because all of the
arguments and fighting were directed at her.  Mother believed that the incident
constituted physical violence, not family violence.[20] 

          The
second domestic violence call involved an argument between Father’s mother and
Kimberly, and Kimberly left.  Mother was not involved. 

                             d.       Conditions
of Houses

          Mother
did not recall how filthy her home was when Ashley Hambrick, the CPS
investigator, came before the children were removed.  Mother did not recall
Hambrick’s telling her that the house had an odor because of the carpet.  Mother
said that she cleaned her house every day and that she bought bug spray to get
rid of the cockroaches. 

          Mother
also tried to make repairs to get the rent reduced, but the landlords did not
always help out like they had promised.  Mother’s landlord Ms. Thorp accused
Mother of stealing a lawn mower and some tools.  Mother said that Ms. Thorp had
asked Kimberly to spray paint the lawn mower silver, and she did.  The police
investigated, and Kimberly took the lawn mower to the police station.  Mother
had no convictions for theft at the time of the termination trial. 

          Mother
believed that she had moved four times during this CPS case. Mother did not
move every time that she was behind on rent to avoid being evicted, but she did
move once or twice to avoid being evicted.  Mother agreed that did not show
stability. 

          At
the time of the termination trial, Mother had lived in her own home since
February 15, 2011, and had signed a lease through July 31, 2011.  It was a
two-bedroom, one-bath home.  The home was in better condition than the other
homes that Mother had lived in and did not require repairs.  Mother had two
beds in each bedroom, couches in the den, and a kitchen table.  Mother
testified that her home was appropriate. 

                             e.       Services

          Mother
recalled that her service plan required her to have healthy relationships and
to complete anger management classes, homemaking services, and counseling.  Mother
testified that she had completed all of her services.  

          Mother
completed a healthy relations course through Friends of Family and watched
videos about domestic violence. 

          Mother
testified that she had learned in her anger management classes that when she
becomes angry, she should take a walk, read a book, listen to the radio, go to
the park, go somewhere quiet, or sit on the porch. 

          Mother
testified that she had completed the homemaker class and had learned “a lot”
from her parenting classes, including how to keep the stove and refrigerator
clean with soap and water.  Mother testified that she did not take Barbra
Haflich, who coordinated social services for Denton Independent School
District, up on her offer to help her with parenting-related issues because she
was scared and did not know what to do.[21]


          Mother
started counseling with Dr. Greer around May 20, 2010, but the counseling did
not go well.  Mother said that Greer said negative statements to her that made
her uncomfortable, but Mother could not recall the negative statements.  Mother
was still attending counseling with Mark Dittloff at the time of the trial.  Mother
told Dittloff that she wanted more counseling because she felt like she was
learning a lot from him.  Mother said that she talked about her children in
counseling and about how to develop a support system.  Mother said that her
support system included her mother, father, and sister, who supported her financially
but would not testify because they had prior CPS involvement. Mother’s support
system did not like Father.  Mother had learned during her counseling that her
relationship with Father was not good for her.  Mother agreed that it had taken
time to learn that because she had been with him a long time.  Mother had also learned
that it was not a good environment for Mother, Father, Kimberly, and Mother’s
children to be living together. 

          Mother
believed that she had abided by the portion of her service plan that had ordered
her not to engage in criminal activity.  She said that an argument did not
constitute criminal activity and that although the police were called in
November when Kimberly attacked her, Mother was not arrested.  She said that
the police told her to leave, and she agreed to leave in lieu of being
arrested. 

          When
Mother was asked whether it was important for a small child to have stability,
Mother asked what that was.  Stability was explained as a child being able to
rely on his mother and father every day, and Mother said that was important.  Mother
testified that as of the time of the termination trial, she was in a stable
home.  However, Mother agreed that moving four times did not show her children
that her life was stable.  Mother understood that the court orders required her
to maintain a stable home for at least six months and that she had only been at
her new address for two months at the time of the termination trial. 

          Mother
was not required to provide monetary support for her children. Mother bought
them clothes, toys, and food totaling $30 each month while they were in CPS’s
care.  Mother said that she gave each child $1.50 at the last visit. Mother
agreed that not paying to support her children, in kind or in cash, did not
show her children that her life was stable. 

          Mother
completed her psychological evaluation May 25, 2010.  Mother testified that her
IQ was sixty-five.  Mother did not recall that Dr. Foster, who had conducted
Mother’s psychological exam, recommended that she go to MHMR. Mother said that
she went to MHMR on her own because “everyone” was telling her to go. 

          Mother
went to MHMR in September 2010 and was told to return on December 2, 2010.  Mother
went back to MHMR on December 2, 2010, and told them that she was living with
her mother.  She said that she spent her days cleaning the house and watching
television with her children.  Mother was told to come back for a psychological
exam to see if she was eligible for services.

          Mother
underwent the psychological exam on January 10, 2011.  Mother received a letter
dated January 24, 2011, stating that she had a diagnosis of mental retardation
and was eligible for services.[22]


          Mother
underwent a second evaluation in March 2011.  Around March 21, 2011, a
representative from MHMR came to Mother’s house and gave her paperwork with a
year-long plan for her.[23]
 Mother requested services in employment assistance and “home community.” 

          MHMR
called to schedule appointments with Mother on days that she already had
appointments.  Mother told MHMR that she was too busy to have extra
appointments because she was attending therapy Tuesdays, Thursdays, and
Saturdays every week.[24]
 Mother testified that she believed that MHMR understood her to say that she
was busy all the time.  Mother said that not being willing to follow up on her
MHMR issues did not show her children that she was stable. 

          Mother
agreed that she needed to demonstrate to CPS that she had learned from her
services, and she said that she had shown CPS that she had developed healthy
relationships and anger management.  Mother testified that she had made
positive changes for the benefit of her children in counseling with Dittloff.  Mother
had also leased a house on her own and was living on her own. Mother said that
she was a better parent now because “[p]eople do change” and because she had
“learned a lot from then until now.” 

                             f.       Employment
and Income

          Mother
did not graduate from high school; she dropped out when she was in the eleventh
grade because she had a baby.  Mother recalled that she had a one-day job in
Lewisville that paid ten dollars an hour.  Other than that, Mother has never
worked.  Mother received $674 per month in SSI and $200 in food stamps.  Mother’s
rent was $550, her electric bill was approximately $97, and her part of the
cell phone bill was $50 or $60 per month. 

          Dea
Davis talked to Mother about working on her GED, and Mother enrolled in a GED
class in January 2011 and was attending consistently.  Mother was halfway
through at the time of the trial, having completed thirty of the sixty required
hours. 

          Mother
said that she had “an assistant coach” who was supposed to be helping her get a
job.  Mother testified that she was trying to get a job and had applied at
Express Personnel but that it had been a long time ago. 

                             g.       Visits

          Mother
testified that she visited her children almost every week that she was scheduled
for a visitation.  Mother did not miss any visits while they were scheduled in
Denton, but she had missed two or three visits after they were moved to
Lewisville because Mother lived in Denton and had a hard time finding
transportation to Lewisville.  Mother admitted that she had received rides from
Father, her mother, and her sister.[25]
 Mother missed visits when Father’s truck broke down.[26]  During the visits, Mother
read books to the children, played with them, colored with them, talked with
them, and asked how school was going. 

                             h.       Mother’s
Request and Plans

          Mother
asked the trial court to return her children to her, if not on a permanent
basis, at least on a monitored return because she had completed her services
and had rented an appropriate home.  Mother wanted to show the court that she
could take care of her children without Father and Kimberly.  Mother testified
that if her children were returned to her, H.N.H. would attend Tomas Rivera
Elementary School, which was down the street from her house, but Mother had not
looked into whether her home was in that school’s district.  Mother also had
not looked into daycare for her other two children. 

                    5.       Counselor’s
Perspective

          Mark
Ditloff, a licensed professional counselor with the Counseling Center of
Denton, testified that he began meeting with Mother in October 2010 to help her
improve her decision-making.[27]  In order to improve
Mother’s decision-making, Ditloff talked to Mother about developing a support
group made up of people whom she could ask questions about the development of
her children and whom she could contact in emergencies.  Mother talked about Father
as a person that she could turn to,[28] but Ditloff did not see
any follow-through from Mother regarding developing a proper support group. 

          Ditloff
went over with Mother the results and recommendations from her psychological
evaluation, including whether she understood the findings regarding her IQ.  Ditloff
thought Mother was confused at times about why CPS was involved in her life; she
understood the specifics, but she did not understand why the circumstances led
to the children’s removal.  As they talked, Mother seemed to appreciate the
risks that her children had been placed in.  

          By
January 2011, Mother used the counseling sessions for maintenance; she came to
the sessions with situations from her life and discussed the decisions that she
had made.  Although Ditloff heard only Mother’s side of the situations, he
thought that there were times when Mother had made positive decisions.  For
instance, Mother went to MHMR to seek employment assistance and had completed
most of her service plan.  However, Ditloff said that Mother’s decision-making
did not go in the right direction when it related to dealing with her Court-Appointed
Special Advocate worker.  Ditloff talked to Mother about how she needed to be
able to get along with her CASA worker, but Mother eventually stopped talking
with the CASA worker.  Other times, Mother delayed finding proper housing,
continued to have contact with someone who had put her children at risk, and failed
to seek out ways to support her children financially.  

          The
planned topic for the February 8 session was supposed to be Mother’s house and
how she could make sure that it was appropriate for her children.  But because
Mother had been involved in a car accident,[29] the topic shifted to
discussing the pain that she was in. 

          Throughout
the counseling sessions, Ditloff never saw Mother interact with her children,
so he could not evaluate her parenting skills.  Ditloff, however, testified
that over time, Mother had developed more thought processes, and getting her
children back was “usually the paramount issue in how she chose to make those
decisions.”  Mother also became more comfortable using resources for her
situation and was using those resources to help her make better decisions.   

          Ditloff
opined that Mother had tried to improve her decision-making and to deal with
and change the situations that had led to the removal of her children. Based on
what Mother had told Ditloff, he believed that she had removed the risk that
she posed to her children.  Ditloff believed that Mother was getting things in
place—i.e., a house—so that she would have the opportunity to care for her
children, but Ditloff agreed that there was more to caring and protecting children
than having a clean house.  Ditloff testified that Mother needed more
counseling and that Mother wanted more counseling. 

                    6.       CASA
Volunteer’s Perspective

                             a.       Condition
of Homes

          Andrea
Calloway, a CASA volunteer who was assigned to the case in April 2010, met with
Father’s mother and learned that the condition that the children were in at the
time of the removal was a normal occurrence for them.  Calloway first visited
Mother’s home on Mockingbird Street on May 21, 2010.  When she walked into
Mother’s house, she detected a “really bad odor” that “smelled a lot like dog
and smoke and just a combination of things.”  The living room was “picked up,”
but the carpeting was very, very dirty and soiled.  The kitchen “looked pretty
decent.”  One of the bedrooms was filled with Kimberly’s belongings, another
room had pallets on the floor and either a twin bed or futon, and the master
bedroom contained a king-sized bed and a twin mattress propped against the
wall.  

          Calloway
visited Mother’s second home and found that it was worse than the one on
Mockingbird.  Calloway said that the odor “was far worse” and that the boys’
bedroom had a “very, very powerful” urine odor that made Calloway “a little
ill.”  Mother told Calloway that they had a dog, but that did not explain all
the odors; Calloway told Mother that she needed to rip out the carpet and
sanitize the room.  Calloway observed roaches and other bugs in the homes and
testified that those kinds of pests carry diseases and create a risk of
physical harm for children. 

          Calloway
testified that Mother had reached agreements with most of her landlords that
she would perform repairs on the homes in exchange for lowered rent, but Mother
did not complete the repairs and was subjected to eviction.  Three or four
times during the case, Calloway offered to take Mother apartment hunting or
house hunting, but Mother would not go because she would not be able to stay
with Kimberly and Father. 

          With
regard to the home Mother rented before the termination trial, Calloway said
that it was appropriate.  Calloway had spoken with Mother’s landlord who said
that Mother had signed a six-month lease.  Calloway, however, did not believe
that Mother would be able to maintain her home because her disability income
barely covered the rent.  Calloway said that Mother, Kim, and Father with their
combined income of $3,000 could not pay their bills without the children in the
house, so CASA was concerned how Mother could provide for three children on
$674.[30] 

          In
her report, Calloway noted that “CASA questions [Mother’s] ability to maintain
a safe and suitable home for her children.”  Calloway explained that CASA’s
concern was that Mother went from one place to another four times during the
case and that the places were not appropriate for the children because the
houses were in very poor condition and were “very, very dirty.”  Calloway
testified that the instability in housing created emotional harm for the
children and that she believed that Mother’s children had fears regarding their
permanent and forever home. 

b.       Relationship with Father and
Kimberly, Anger Management, and Domestic Violence

          Calloway
testified that Mother did not regard her relationship with Kimberly and Father
as unusual; Mother did not see anything wrong with it.  But Calloway
disapproved of the sexual relationship that Father had with Kimberly and Mother
while the children were living there.  Calloway said that when women are being
shared by a man, it creates a very chaotic and violent environment.  She said,
“There’s so much competition between the two women for the affections of this
man that the children get pushed aside and neglected, and it’s hard on them
emotionally.” 

          Calloway
talked to Mother about anger management when Mother became upset after Father
had abandoned her at the CPS office in June and told her that he did not want
her anymore.  Calloway took Mother home, told her that she needed to get away
from Father and Kimberly, and offered her help to do that.  Calloway later went
back to the home on Mockingbird to perform an unannounced visit and saw Mother,
Father, and Kimberly leaving together. 

          After
Mother completed anger management in June or July 2010, there was another
incident of domestic violence in August 2010, which indicated to Calloway that
Mother had not learned anything in her anger management class. Mother called
Calloway on November 7, 2010, which was the day after one of the domestic
violence incidents.  Mother told Calloway that the previous night, Father had
kicked her out, had pulled her hair, had kicked down the door, had broken a
window, and had punched a hole in the wall, and the police were called. 

          Calloway
was concerned about the family violence between Father, Kimberly, and Mother,
which occurred more often than just the two domestic disturbances that the
police responded to.  The children told Calloway that there was “a lot of
screaming and yelling, throwing things, [and] hitting” and that it scared them.
 Calloway testified that family violence in the home created a risk of physical
or emotional abuse for the children and that the children were at risk of
physical or emotional harm whenever they saw family violence in the home. Calloway
was also worried about the children’s health and safety because Kimberly had
proven to be violent with children and that she sometimes cared for Mother’s
children.

          Calloway
said that the relationships the children observed in the home affected their
future development as young men and women because the children mimicked the
behaviors demonstrated by the adults, who served as the children’s role models;
it also affected the way that the children perceived how they should treat
members of the opposite sex.  Calloway testified that she believed that the
type of behavior that the family engaged in was harmful for the children and
was not appropriate. 

          Although
Mother had not lived with Father and Kimberly since December 2010, Calloway did
not believe that Mother had ended her relationship with Father.  Calloway had
received information from CPS that Mother had been seen with Father and
Kimberly since Mother had moved into her own home.  Calloway was also aware
that Mother was with Father as recently as the Friday afternoon prior to the
termination trial.  Thus, Calloway had not seen anything that would indicate to
her that Mother, Father, or Kimberly had alleviated the risk of harm to the
children. 

                             c.       Support
System

          Calloway
interviewed Mother’s extended family and did not believe that they would be
sufficient to support Mother and her three children; Calloway said that
“[t]heir heart is in the right place, but they’re afraid of [Father]” and that
they were raising some of their other grandchildren.  Early in the case, Mother
rejected joint custody with a paternal aunt and uncle who were willing to help
her manage her money and maintain a home; Calloway said that Mother did not
give a reason for not wanting to move to San Antonio to take advantage of their
help. Calloway further testified that she knew that the aunt had kidney
problems and that this was a concern with CPS as far as placement. 

                             d.       Services

          Calloway
talked to Mother about her services and told her that it was very important to
complete all of her services.  Calloway told Mother that it was not enough to “just
check the boxes”; CASA expected to see a significant change in her lifestyle
and behaviors in order for a recommendation to be made that her children should
be returned to her.[31]  Calloway said that it
does a parent no good to work the services if she does not learn anything. 

          Mother
completed First Step, but Calloway did not believe that Mother had benefitted
from the program.  Calloway testified that after Mother had completed the
program, “the home got worse”; there was even more damage to the home due to
domestic violence (i.e., windows were broken out), and the home was dirty
(i.e., the floors were covered in grit such that Calloway made a “crunch” noise
walking across the floor).

          A
referral was made for Mother to attend Denton County Friends of the Family so
that Mother would extricate herself from Father and Kimberly.  Mother did not
benefit from that service, and her participation did not sufficiently alleviate
the risk of abuse to her children. 

          Mother
had not refrained from engaging in criminal activity; she had engaged in domestic
violence in November 2010.  Calloway, however, was not aware that Mother had
walked away from Kimberly, nor was Calloway aware that Mother had to use
self-defense to get out of the situation. 

          At
the temporary hearing, the Department did not ask Mother to pay money in child
support because they believed that would be setting her up to fail. The
Department, instead, requested that Mother provide in-kind support. Calloway
observed that Mother usually brought food to the visits and that during the
visits that occurred near the children’s birthdays, Mother brought some
clothing and toys.  Calloway did not believe that the support Mother had
provided for the children was “anywhere close to remotely adequate to support
three children,” nor did she believe that Mother had done her best to support
her children while they were in CPS’s care. 

          Calloway
summarized that Mother had completed anger management classes, a healthy
relations class through Friends of the Family, a psychological examination, and
homemaker classes; had not been convicted of a crime; had appropriate visits
with her children; and had participated in counseling through MHMR.  Mother had
not lived in her home for six months as required under the plan, but her home
at the time of the termination trial was suitable.  

                                      e.       CASA’s
Recommendation and Plan

          Calloway
did not believe that Mother could appropriately parent her children.  As a
result, Calloway asked the trial court to terminate Mother’s parental rights to
her three children because CASA believed it was in the children’s best
interest.[32]  

                    7.       Attorney
Ad Litem’s Perspective

The
attorney ad litem for the children testified that 

this case is really
unfortunate because I don’t think [Mother] is a bad person at all.  I have no
doubt she loves her kids.  My concern, though, is for -- is her ability to
properly care for and protect her kids.  And all we have to go by is the track
record. 

 

I kept listening for
something that would assure me so I could assure the court that that she could
properly care for her kids.  I haven’t been able to find one.  And we have the
Spic and Span incident [sic] and we had the 2008 burn incident and we had the
January referral and then the March removal.

 

And I heard her
saying that she was blaming [Kimberly] for the removal of her kids, but that’s
just not the case.  We heard her testify the kids weren’t dirty when they were
removed, and we all know that’s not true.

 

And
I do have to say that I admire her for being here, representing herself.  I
mean, everybody else has abandoned her but she’s here, and I admire that about
her.  But -- and I kept looking for every alternative to termination, but I
haven’t been able to find it.  So for the safety of the kids, I would have to
join with CASA and CPS and recommend termination. 

          F.       Trial
Court’s Disposition

          After
hearing the above testimony, the trial court found by clear and convincing
evidence that Mother had knowingly placed or knowingly allowed the children to
remain in conditions or surroundings that endangered the physical or emotional
well-being of the children, that Mother had engaged in conduct or knowingly
placed the children with persons who had engaged in conduct that endangered the
physical or emotional well-being of the children, and that termination of the
parent-child relationship between Mother and H.N.H.; J.L.H., Jr.; and J.N.H. was
in the children’s best interest.[33]


III.  Legally Sufficient Evidence
to Support Endangerment Findings

In
her first, second, fourth, fifth, seventh, and eighth points, Mother argues
that there is legally insufficient evidence to establish the termination
grounds under family code section 161.001(1)(D) and (E) for each of her three
children. The Department argues that there was ample evidence to support the
trial court’s conduct and environment findings because the trial court was
entitled to find that Mother endangered her three children by failing to
maintain safe and stable housing, by participating in domestic violence, by engaging
in and continuing inappropriate relationships, by failing to adequately and
appropriately care for her children by herself, and by failing to establish a
support system to assist her. 

A.  Burden
of Proof and Standards of Review

          A
parent’s rights to “the companionship, care, custody, and management” of her
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  See
Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987); In re D.T., 34 S.W.3d 625,
629 (Tex. App.—Fort Worth 2000, pet. denied).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. § 161.001; see also § 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable changes
for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002);
see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007) (contrasting
standards for termination and modification).

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not unreasonable. 
Id. at 573.

B.  Law
on Endangerment

          Endangerment
means to expose to loss or injury, to jeopardize.  Boyd, 727 S.W.2d at
533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no
pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), the Department had to prove that Mother
knowingly placed or allowed her children to remain in conditions or
surroundings that endangered their physical or emotional well-being.  See
Tex. Fam. Code Ann. § 161.001(1)(D); In re J.A.J., 225 S.W.3d 621,
625 (Tex. App.—Houston [14th Dist.] 2006) (op. on reh’g), judgm’t aff’d in
part, rev’d in part, 243 S.W.3d 611 (Tex. 2007).  Subsection (D) focuses on
the suitability of the children’s living conditions.  J.A.J., 225 S.W.3d
at 626.  Thus, under subsection (D), it must be the environment itself that
causes the children’s physical or emotional well-being to be endangered, not
the parent’s conduct.  Id. at 627.

          Under
subsection (E), the relevant inquiry is whether evidence exists that the
endangerment of the children’s physical well-being was the direct result of
Mother’s conduct, including acts, omissions, or failures to act.  See J.T.G.,
121 S.W.3d at 125; see also Tex. Fam. Code Ann. § 161.001(1)(E). 
Additionally, termination under subsection (E) must be based on more than a
single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. § 161.001(1)(E).  It is not necessary, however, that
the parent’s conduct be directed at the children or that the children actually
suffer injury.  Boyd, 727 S.W.2d at 533; J.T.G., 121 S.W.3d at
125.  The specific danger to the children’s well-being may be inferred from
parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re
R.W., 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied).  As a
general rule, conduct that subjects children to a life of uncertainty and
instability endangers the children’s physical and emotional well-being.  See
In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied). 
To determine whether termination is necessary, courts may look to parental
conduct occurring both before and after the children’s births.  In re D.M.,
58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). 

C.  Evidence
Is Legally Sufficient to Support Endangerment Findings

          In
determining whether the evidence is legally sufficient to support termination
of Mother’s parental rights pursuant to subsection (D) or (E), we look at
whether Mother (1) knowingly placed or knowingly allowed her children to remain
in conditions or surroundings that endangered their physical or emotional
well-being or (2) engaged in conduct or knowingly placed her children with
persons who engaged in conduct that endangered their physical or emotional
well-being.  See Tex. Fam. Code Ann. § 161.001(1)(D), (E).  The
Department’s brief focuses on the following acts or omissions by Mother that it
contends support termination of Mother’s rights under (D) and (E):  failing to
maintain safe and stable housing, participating in domestic violence, engaging
in and continuing inappropriate relationships, failing to adequately and appropriately
care for her children by herself, and failing to establish a support system to
assist her.  We will examine all of the evidence in the record, focusing on these
allegations. 

          The
places that Mother chose for her family to live exhibited unsafe living
conditions for children.  The homes had roaches, flies, terrible odors, and
broken windows that made heating difficult.  Rotten food was also found left
out in the kitchen at one of the houses.  This is some evidence that Mother
knowingly placed or knowingly allowed her children to remain in conditions or
surroundings that endangered their physical or emotional well-being.  See In
re K.M.B., 91 S.W.3d 18, 24–25 (Tex. App.—Fort Worth 2002, no pet.)
(holding that evidence that Mother exposed children to homes with roaches and
lice problems, animal feces, terrible odors, and general filth supported
environmental endangerment finding).

          Additionally,
the record demonstrates that the children had witnessed domestic violence and inappropriate
relationships.  The children lived in a house with three adults and witnessed the
three adults screaming, yelling, hitting, and throwing things.  The CASA
volunteer testified that this behavior scared the children, and CPS was
concerned that one of the children could be injured.   The record contains
evidence that Mother had used a toy truck to hit one of Kimberly’s children and
had spanked her children and Kimberly’s children with a belt.  Although there
is no evidence that Mother physically abused her own children, Mother often
allowed Kimberly to watch Mother’s children, and Kimberly admitted to causing
the injuries on her child that led to the removal of all of the children in the
house.  Moreover, the children knew that Father slept with Mother some nights
and with Kimberly some nights; yet, Mother did not seem to understand the
impropriety of the living arrangements—even after CPS’s repeated warnings—and
continued to live with Father and Kimberly for approximately eight months after
Mother’s children were removed.  Mother also continued to associate with Father
and Kimberly up until a month before the termination trial and had not removed
them from her cell phone plan at the time of the termination trial.  This is
some evidence that Mother’s conduct, as well as the conduct of those she
exposed her children to, endangered them.  See In re M.R., 243 S.W.3d
807, 819 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of
exposing a child to domestic violence supports an endangerment finding).

          The
record also demonstrates that Mother was unable to adequately provide for her
children.  Mother had virtually no employment history and had only recently
worked towards obtaining her GED.  Mother depended on Father and Kimberly to help
provide her and her children with basic necessities, including food and
housing.  Mother brought in-kind support in the form of food and gifts to the
visits, but Calloway did not believe that the support Mother had provided for
the children was “anywhere close to remotely adequate to support three children.”
 Nor did Calloway believe that Mother had done her best to support her children
while they were in CPS care.  After living at four different residences during
the time the case was pending, Mother rented her own home approximately two months
before the termination trial.  But the record revealed that Mother’s finances
would make it almost impossible for her to continue to live there and that the
children had fears regarding their permanent and forever home.  This is some
evidence that Mother’s conduct, including omissions, endangered her children’s
physical or emotional well-being and that Mother exposed her children to an
unstable environment that endangered her children’s physical or emotional
well-being.  See In re T.C., No. 10-10-00207-CV, 2010 WL 4983512, at
*4–5 (Tex. App.—Waco Dec. 1, 2010, pet. denied) (mem. op.) (holding that
although there were recent developments that showed improvements in mother’s
stability, the trial court could reasonably have determined that any evidence
of improvement was short-lived and outweighed by the extent of her prior
history; thus, the evidence supported that mother, by living in fifteen
locations among other things, had engaged in conduct that endangered the child’s
physical and emotional well-being).

          The
record also demonstrates that Mother was unable to properly care for her
children.  Mother did not seek treatment for H.N.H. when she received
second-degree burns.  After a concerned relative called in a referral, police
responded and immediately called EMS. The four-hour delay that occurred before
H.N.H. received treatment for second-degree burns, which required an overnight
hospital stay, was “pretty significant.”  The record also contains no evidence
that Mother sought treatment for H.N.H. when she poured Mop & Glo on
herself at age one.  Mother failed to get up in time to feed H.N.H. before she
went to school, which resulted in stomachaches and which the record revealed could
harm H.N.H.’s physical and emotional development.  Mother failed to treat H.N.H.’s
asthma, and all of the children were dirty.  Due to Mother’s verbal IQ, the
record revealed that she was likely to have trouble following directions, like
those for asthma and lice medication, which created significant risks to her
children.  Moreover, the record is replete with evidence that Mother had failed
to properly treat and eradicate lice in her children’s hair for approximately
two years.  Furthermore, Mother failed to establish a proper support system to
help her care for her children.  This is some evidence that Mother’s conduct,
including omissions, endangered the children’s physical or emotional
well-being.  See In re S.H.A., 728 S.W.2d 73, 87 (Tex. App.—Dallas 1987,
writ ref’d n.r.e.) (holding that evidence that parents did not properly feed
child and did not seek appropriate medical treatment for child was some
evidence to support jury’s findings that parents had engaged in conduct which
endangered child’s physical or emotional well-being).

          Viewing
all the evidence in the light most favorable to the termination judgment and
disregarding all contrary evidence that a reasonable factfinder could
disregard, we hold that some evidence exists that will support a factfinder’s
firm conviction or belief that Mother violated subsections (D) and (E).  We
thus hold that the evidence is legally sufficient to support termination of
Mother’s parental rights to H.N.H.; J.L.H., Jr.; and J.N.H. under subsections
(D) and (E).  See Tex. Fam. Code Ann. § 161.001(1)(D), (E); K.M.B.,
91 S.W.3d at 24–25 (holding evidence legally sufficient to support trial
court’s 161.001(1)(D) finding because evidence showed that Mother exposed
children to homes with roaches and lice problems, animal feces, terrible odors,
and general filth); In re S.K., 198 S.W.3d 899, 906–07 (Tex. App.—Dallas
2006, pet. denied) (holding evidence legally sufficient to support trial court’s
161.001(1)(E)[34]
finding because evidence showed that children were dirty regularly and often
had lice, that parents exhibited limited parenting skills and did not
understand issues involved in children’s developmental needs, and that CPS had
seen no changes in parents’ pattern of behavior through course of case); see
also In re Z.A.S., No. 02-11-00040-CV, 2011 WL 3795231, at *15–16
(Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (holding evidence
legally sufficient to support trial court’s 161.001(1)(D) and (E) findings
because evidence showed that Mother, among other things, had moved frequently,
had limited employment, and had chosen homes with unsafe living conditions for
children); In re J.G.K., No. 02-10-00188-CV, 2011 WL 2518800, at *39–41
(Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.) (holding evidence
legally sufficient to support trial court’s 161.001(1)(D) and (E) findings
because evidence showed that Mother, among other things, had failed to seek
medical treatment for child, had moved frequently, had limited employment, and
had exposed her children to domestic violence); In re T.H., No.
02-07-00464-CV, 2008 WL 4831374, at *4–5 (Tex. App.—Fort Worth Nov. 6, 2008, no
pet.) (mem. op.) (holding evidence legally sufficient to support trial court’s
161.001(1)(D) and (E) findings because evidence showed that father had engaged
in conduct that subjected his children to a life of instability and
uncertainty, including living at more than five residences over five years and
living in residences that were “genuinely dirty” and in disarray; had used
illegal drugs; had engaged in domestic violence; and had exhibited anger
issues).[35]

          We
therefore overrule Mother’s first, second, fourth, fifth,
seventh, and eighth points.  Because termination based on one subsection of
section 161.001(1) will support termination, we need not address Mother’s
third, sixth, and ninth points challenging the termination of her parental
rights based on section 161.001(1)(O).  See Tex. Fam. Code Ann. §
161.001(1); Tex. R. App. P. 47.1 (requiring appellate court to address only
issues necessary to final disposition of the appeal).

IV.  Conclusion

          Having
disposed of every point necessary for final disposition of this appeal, we affirm
the trial court’s judgment terminating Mother’s parental rights to H.N.H.;
J.L.H., Jr.; and J.N.H.

 

 

SUE WALKER
JUSTICE

 

PANEL: 
WALKER,
MCCOY, and MEIER, JJ.

 

DELIVERED:  January 12, 2012









[1]See Tex. R. App. P. 47.4.





[2]The record includes
petitioner’s exhibits 3, 4, and 5 showing that Mother took the children to Dr.
Nuby to obtain lice treatment and that he was unable to eradicate the problem. 





[3]We refer to the Texas
Department of Family and Protective Services interchangeably as “the
Department” and “CPS.”





[4]Kolb was aware that Mother
had called some relatives and had attempted to treat H.N.H.’s burns with
mayonnaise and possibly margarine and Neosporin, but Kolb testified that the
burns were “very severe.” 





[5]Lopez made clear that she was
not saying that Mother’s spankings of the children caused the injuries. 





[6]Kimberly later admitted
that she had injured her child. 





[7]The GED course and a
literacy class were not ordered by the court. 





[8]Davis had visited the
children in their current placement, and they were doing well.  All three
children received play therapy, and H.N.H. and J.L.H., Jr. received speech
therapy. 





[9]In various places, the
record states that Mother was in her home either three weeks or three months at
the time of the trial.  However, the testimony reveals that Mother’s lease
started on February 8 and that she moved in on February 15, 2011.  The
termination trial was on April 11, 2011.  So Mother had been in her home for
two months at the time of the termination trial.





[10]CPS was also concerned
that Mother’s young children had knowledge that Father rotated between Mother
and Kimberly; thus, CPS did not approve of the sexual relationships that had
been taking place.





[11]Davis, however, agreed
that it was possible that Mother might stay away from Father and Kimberly if
the children were returned to Mother. 





[12]In September 2010, Davis
had evidence of a continued relationship between Mother and Father.  Despite
Mother’s knowledge that removal was the goal of CPS, she continued to make
contact on many occasions with Father and Kimberly.  Davis testified that one
of her coworkers, Veronica Tackett, saw Mother, Father, and Kimberly together
at an AT&T store on February 8, 2011, despite Mother’s having been
encouraged to stay away from Father and Kimberly. 





[13]Although the Department
did not move to terminate Mother’s parental rights based on mental illness, see
Tex. Family Code Ann. § 161.003(a) (West 2010), we include the
psychologist’s testimony because it is relevant to the endangering conduct
finding.





[14]Foster explained that
“IQ” refers to how fast a person learns and said that some people never get to
more advanced, abstract thought processes.  Foster did not make a diagnosis of
mild mental retardation because that diagnosis cannot be made solely by an IQ
score; he said only that Mother’s IQ score fell in that range.





[15]Hickey assumed that
Mother did not call poison control after H.N.H. doused herself with Mop &
Glo because Mother did not tell her that she had called poison control. 





[16]Hickey had observed that
Mother could read on a low level but had to ask questions about the words.





[17]Hickey last visited
Mother in January when Mother was living with her mother.  The home was clean
but had roaches. 





[18]Lopez testified that Mother’s
parents and sister had a history of involvement with CPS; they had referrals
for drug use, the condition of their homes, and sexual abuse.  The cases were
ruled “reason to believe.” 





[19]Mother testified at one
point that no one told her that she could not be around Father, only that she
was not supposed to be around Kimberly. 





[20]When asked about the fact
that her children had reported that Mother and Father threw things at each
other, Mother said that she and Father did not do that. 





[21]Haflich testified that
H.N.H.’s school contacted her because H.N.H. was not verbalizing in the
classroom and was “a little bit behind” the other kids.  Haflich met with
Mother and talked about how Haflich could help her, and Mother agreed to meet
Haflich at Evers Park Elementary to do individual work on parenting-related
issues in a voluntary program.  Haflich called Mother a couple of times, but
Mother never called her back.





[22]The letter in the record
actually states that Mother “does not meet the criteria for Mental Retardation
Services” and that the decision was made after a face-to-face interview was
performed, records were reviewed, and testing was conducted.





[23]The “Person Directed
Plan” states that Mother was uncertain that she needed services; she “just wanted
her kids back.” 





[24]Mother said that she was
going to therapy for a car accident that occurred on February 4.  Before the
accident occurred, Mother attended counseling every two weeks. 





[25]Riding the bus was not an
option for Mother; Mother had a fear of riding buses because when she was in
ninth grade, she had ridden on a school bus that hit four or five cars and
injured several people. 





[26]Mother agreed that it was
not Father’s responsibility to transport her to her visits, but she still relied
on him for transportation. 





[27]Mother attended eleven
sessions and missed three; two of the absences occurred when the times and dates
were changed, and Mother confused the times. 





[28]Mother had listed Father
as her emergency contact when she reported for counseling with Ditloff. 





[29]Ditloff was not aware
that Mother was with Father during the car accident.





[30]Calloway noted in her
report that CASA had grave concerns about Mother’s ability to manage her money
effectively.  Calloway learned that Father was the payee on Mother’s SSI card,
but Calloway did not know whether Father was still controlling Mother’s
finances at the time of the termination trial.





[31]Calloway admitted that
the court-ordered service plan did not require Mother to benefit from the
services, only to complete them. 





[32]Calloway noted that the
children were in a foster home with parents who were willing to adopt them.





[33]The trial court also
terminated Father’s parental rights to H.N.H.; J.L.H., Jr.; and J.N.H., but
Father did not appeal.





[34]Although the S.K. opinion
cites section 161.001(1)(D), it is clear from the context—which states that
“Mother engaged in conduct and Father knowingly placed the children with a
person who engaged in conduct which endangered the physical or emotional
well-being of [the children]”—that section 161.001(1)(E) is the subsection that
was intended.





[35]Although Mother claims
that the evidence is insufficient to support the termination of her parental
rights to J.L.H., Jr. and J.N.H. because “there is virtually no mention of
[them] throughout the entire proceedings,” Mother’s argument fails because all
of the children were exposed to the unstable and unsafe living conditions,
domestic violence, and lice.